UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SUSAN ZIEGLER,

    Plaintiff,

v.                                      Case No. 06-CV-12234-DT

DESIREE AUKERMAN, et al,

    Defendants.
                                        /

**OPINION AND ORDER GRANTING SUMMARY JUDGMENT TO DEFENDANTS
AND DENYING PLAINTIFF'S MOTION TO AMEND HER COMPLAINT**

Pending before the court are various summary judgment motions filed by Defendants and a motion by Plaintiff to amend her complaint. The matter has been fully briefed and the court conducted a hearing on November 15, 2006. For the reasons stated below, the court will grant summary judgment to Defendants and deny Plaintiff's motion to amend her complaint.

**I. FACTUAL BACKGROUND**

Plaintiff's claims arise from her contact with a number of hospital and public safety personnel on the night of June 16, 2004. Plaintiff alleges that she went to Defendant Foote Hospital "to get a referral to an outpatient counselor to talk about some family problems." (Pl.'s Compl. at ¶ 11.) According to hospital records, Plaintiff's husband brought her to the hospital because she was depressed and became suicidal. (Dr. Brown Dictation, Def. Aukerman's Ex. D.) She arrived at the hospital at about 8 p.m. (Emergency Services Record at 3, Def. Aukerman's Ex. E.) In the first half hour,

Plaintiff allegedly reported that she was suicidal and planned to drive her car into a tree. (*Id.*)[1]

At 9:40 p.m. Plaintiff asked to go outside with her husband. (*Id.*) She did not return and, when hospital staff could not locate her, police were notified and sent to Plaintiff's home. (*Id.*) At 11:00 p.m., Plaintiff, who was still tearful, reappeared at the hospital. (*Id.* at 5.) The police were notified and presumably told to not go to her home. (*Id.*)

Defendant Aukerman, a nurse in the emergency room, reported (without specifying when) that Plaintiff stated she was "at the 'end of my rope[,]'" thought about driving her car into a tree, and was "very tearful throughout the entire conversation." (Application for Hospitalization, Def. Aukerman's Ex. B.) Aukerman indicated that she believed Plaintiff had a medical illness that caused Plaintiff to pose a risk of serious physical injury to herself or to others within the near future. (*Id.*)[2] Defendant Brown, a doctor at the hospital, diagnosed depression and quoted the same "end of the rope" statement by Plaintiff. (Clinical Certificate, Def. Aukerman's Ex. A.) Brown claimed that she observed Plaintiff for two hours beginning at 11:00 p.m.[3] Brown also reported that

---

[1] Plaintiff denies that she expressed any suicidal thoughts. (8/28/06 Pl.'s Aff at ¶ 4, Pl.'s 9/14/06 Br., Ex. 1.)

[2] Plaintiff denies that she was mentally ill "at the time of these events" or that she has ever otherwise been treated for mental illness. (Pl.'s Compl. at ¶ 11.) She claims that Aukerman lied in her report or at least did not have a sufficient basis for her conclusion. (*Id.* at ¶ 17.)

[3] Plaintiff alleges that Brown spoke to her "about five minutes" and that Brown lied about Plaintiff's condition in the clinical certificate or at least "did not have probable cause or a reasonable belief" regarding Plaintiff's alleged dangerousness. (Pl.'s Compl. at ¶¶ 21-22.)

2

Plaintiff expressed plans to run into a tree on the way home from work. (*Id.*) In the same report, which is dated June 17, 2004 at 1:20 a.m., Brown concluded that Plaintiff required hospitalization because Plaintiff, as a result of mental illness, was unable to understand the need for treatment and posed a risk of significant physical harm to herself or others. (*Id.*)

At about 2:30 a.m., Plaintiff stated that the hospital by law could not hold her, and she announced her intention to leave. (Emergency Services Record at 5, Def. Aukerman's Ex. E.) Plaintiff then left. At 2:45 a.m. the police were notified and instructed to pick up Plaintiff at her residence. (*Id.*)[4] She was returned at 3:45 a.m. and was ultimately transferred to another facility. (*Id.*) Plaintiff alleges that the individual

---

[4]Defendant Roe, a 911 operator, dispatched Defendant Jonoshies, a police officer, to Plaintiff's residence, and Jonoshies returned Plaintiff to the emergency room. (Pl.'s Compl. at ¶¶ 29, 33, 36-37.) Jonoshies filed an affidavit stating that (1) dispatch told him there was a clinical certificate requiring Plaintiff's return to the hospital, (2) he obtained a copy of the certificate and attached it to his police report, and (3) that he did not know if a court order was required but "assumed the hospital had completed all the necessary paperwork since they are experts and I believed that the message I received from dispatch meant that all necessary paperwork had been completed." (Jonoshies Aff. at ¶¶ 3, 6-7, Def. Jonoshies's Ex. A.) Plaintiff, meanwhile, presents affidavits by her and her husband stating that Jonoshies claimed he was taking her into custody pursuant to a court order. (Pl.'s Aff. at ¶¶4-5, 11, Pl's 10/17/06 Br., Ex. 1; Aff. of John Ziegler at ¶ 4, Pl's 10/17/06 Br., Ex. 2.) As the court's analysis below will show, this factual dispute is not material because the relevant question is not what Jonoshies told Plaintiff and her husband but, rather, whether Jonoshies acted in a manner that was unlawful.
   Furthermore, Plaintiff contended at oral argument that there is a factual dispute about whether Roe informed Jonoshies of the certificate because the County dispatch records are terse and only state that Jonoshies was dispatched to retrieve a "suicidal subj." (Incident Maintenance Report, Def. Jonoshies's Ex. B.) The court disagrees. This record on its face does not contradict Jonoshies's statement in his affidavit that he was informed of the certificate. The dispatch record merely fails to corroborate the affidavit. Viewed in the light most favorable to Plaintiff, this failure of the record to corroborate does not constitute a contradiction that would create an issue of fact regarding what Roe told Jonoshies.

defendants worked together to detain her against her will at the "emergency room and in the locked mental ward of the hospital for about eight hours against her will." (Pl.'s Compl. at ¶ 41.) She further claims that a nurse in the mental ward acknowledged that Plaintiff was there by mistake. (*Id.* at ¶ 45.) According to Plaintiff, "[h]ospital staff required that she could not be released until a psychiatrist on the next day shift discharged her." (*Id.* at 44.)

Hassan Almaat, M.D., is the psychiatrist that discharged Plaintiff on June 17, 2004. (Dictated Medical Report, Def. Brown's Ex. F.) The time of discharge is not immediately apparent in the record, but notations at the end of Almaat's report indicate a dictation time of "12:36:45" and a transcription time of "19:54:18." (*Id.* at 2.) Almaat reported that Plaintiff was pleasant, cooperative, alert, coherent, and neutral in mood. (*Id.* at 1.) Plaintiff "denied hallucinations, delusions, or suicidal or homicidal ideations." (*Id.*) He diagnosed depression and recommended a plan to discharge Plaintiff and prescribe her medication. (*Id.*)

Also before the court is the report of Mike Marshall, a mental health evaluator at the hospital who met with Plaintiff on June 16, 2004. (Marshall Report, Def.'s 9/15/06 Br. in Opposition Ex. 2.) The report provides a useful chronology and differs in some respects from other records presented to the court. Due to job instability and increased depression since her mother had to be placed in a nursing home, Plaintiff sought an outpatient referral for counseling services. (*Id.* at 2.) According to the report, Plaintiff:

> states currently that she had thoughts of running her car into a tree, however rejects the idea, notes "that's why I came here, I don't want to do that or be thinking about that" notes that she would never do it. Notes that she has a lot of stress going on in her life, but she has "had worse" and "it always works out, it's just been so hard."

(*Id.*)  The report states that Plaintiff had suicidal ideation, intent and plan but that Plaintiff was able to contract for safety.  (*Id.* at 2-3.)  Plaintiff reported a number of "frustrating events."  (*Id.* at 6.)  She laughed as she told Marshall that she sought help elsewhere[5] and waited in the lobby for three hours "watching Chicken Run (movie)."  (*Id.*)  She then came to the emergency room, spoke to a triage nurse that was "excellent" and was hopeful that she would get a referral.  (*Id.*)  But she again waited three to four hours before seeing a doctor.  (*Id.*)  She went to smoke and was gone for an hour.  (*Id.*)  The nurse grew concerned because of a statement Plaintiff made about suicide.  (*Id.*)  "[Plaintiff] is frustrated with this as she feels that she was not understood correctly when she said she had thoughts of suicide, but no plan or intent."  (*Id.*)

Marshall's report indicates consultation and disagreement with Defendant Brown.  Brown recommended hospitalization and Marshall, who deferred to Brown, recommended outpatient counseling and psychiatric care.  (*Id.* at 7.)  Because Plaintiff would not agree to hospitalization and her husband would not petition for it, Brown stated that she would fill out a certificate and have a nurse file it.  (*Id.*)  According to Marshall, who spoke with a hospital psychiatrist named Samy Wassef:[6]

> I stated I could not fill out a petition as the information I had gained from conversations with [Plaintiff] and her husband was very different from that being told to me by Dr. Brown.  Dr. Wassef was contacted in regard to the admission and agreed that Dr. Brown would have the final decision on [Plaintiff] in regard to appropriate treatment.  Dr. Wassef instructed me to admit [Plaintiff].

---

[5]Due to abbreviations in the report with which the court is unfamiliar, it is unclear where Plaintiff first went.

[6]Wassef is also the subject of Plaintiff's motion for leave to file an amended complaint, which is discussed below in further detail.

5

(*Id.* at 7.)  Before the petition was filed, Plaintiff left the hospital.

> Dr. Brown then confronted me in regard to why [Plaintiff] had left, and also why [Plaintiff] did not have an outpatient referral to go home with.  This questioning about the outpatient referral was curious, as she (Dr. Brown) had quite clearly stated her intent to hospitalize [Plaintiff], meaning she would have no need of a discharge recommendation or referral.  Dr. Brown then stated that she wanted me to call [Plaintiff] at home and give her an outpatient referral as she (Dr. Brown) did not want to send the police out to bring [Plaintiff] back on a safety check.  I questioned Dr. Brown in regard to this plan.  If the patient was at enough risk . . . to justify an involuntary placement, was she not at more risk now that she had left . . . against medical advice?  Dr. Brown then decided to contact the police and have them bring [Plaintiff] back . . . . [Plaintiff] does indeed return in custody of police, not very happy, but still able to laugh at "what a crazy night" it has been.

(*Id.*)

In her own words, Plaintiff states that she left the hospital because she waited a long time for a referral without getting one, that no one was listening to her, that she "started my period there and just wanted to go home[,]" and that her son had a doctor appointment on June 17, 2004.  (Pl.s' Aff. at ¶¶ 3, 8, Pl.'s 10/7/06 Br. in Opposition Ex. 1.)

## II.  PROCEDURAL BACKGROUND

Plaintiff filed her five-count complaint in this court on May 16, 2006.  Her first count alleges an action under 42 U.S.C. § 1983 for Fourth Amendment violations by Defendants Jonoshies and Roe.  (Pl.'s Compl. at 8.)  She claims that these defendants violated her Fourth Amendment rights by, "[w]ithout a warrant or other court order[,]" taking her into police custody and transporting her against her will to a hospital for mental health confinement."  (*Id.*)  Plaintiff's second count alleges the same § 1983 claim against Defendant Jackson County for being deliberately indifferent to "the

constitutional rights of persons being subjected to unlawful mental health commitments with police involvement." *Id.* at 9. Plaintiff alleges that Jackson County failed to train its 911 dispatchers regarding these rights and that the county "has a custom or policy of having no record keeping [sic] system for mental health orders and so its 911 operators have no data base [sic] to verify the existence or terms of such orders before dispatching police to pick people up on a mental health order." (*Id.* at 8-9.) In her third count, Plaintiff alleges gross negligence against Defendants Roe and Jonoshies. She claims that these Defendants "acted recklessly with conscious disregard of whether there was any court process that authorized police to take the plaintiff into custody and to transport her to the hospital or of the law that required such process for an involuntary civil commitment." (*Id.* at 9.) In her fourth count, Plaintiff alleges that all Defendants, with the exception of Jackson County, acted intentionally to unlawfully restrain her and are therefore liable for false imprisonment. (*Id.* at 10.) Finally, Plaintiff asserts a claim of assault against Defendants Aukerman and Foote Hospital. She alleges that these Defendants "made an intentional and unlawful threat to commit a battery on the plaintiff by force, specifically by threatening to forcibly remove plaintiff's clothing" and that "[a]t the time of the threat was made [sic] under circumstances which created in plaintiff a well-founded fear of imminent peril." (*Id.*)

On August 23, 2006, Defendants Auckerman and Foote Hospital filed a motion to dismiss under Federal Rules of Civil Procedure 12(b)(1), (b)(6), 12(c), and 56(b). These defendants argued for dismissal based upon (1) a lack of federal subject matter jurisdiction, (2) failure of Plaintiff to comply with statutory requirements under Michigan law for medical malpractice claims, (3) immunity under Michigan law, (4) failure to state

a claim of false imprisonment, and (5) failure to state a claim of assault. Defendant Brown joined in the motion. (8/24/06 Def. Brown's Concurrence.) On September 20, 2006, Defendant Jackson County filed a motion for dismissal and for summary judgment.[7] The motion claimed that dismissal or summary judgment is appropriate because (1) the protective custody over Plaintiff was reasonable and in compliance with the Michigan Health Code, (2) Roe has qualified immunity, and (3) Plaintiff failed to state a claim of false imprisonment. On September 22, 2006, Defendant Jonoshies filed a motion that overlaps considerably with the arguments presented on behalf of Defendant Roe.

### III. STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate." *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The existence of some factual dispute, however, does not

---

[7]The motion's title indicates that it is "County Defendants'" motion and the body of the motion argues on behalf of Defendants Jackson County and Dispatcher Roe.

8

defeat a properly supported motion for summary judgment; the disputed factual issue must be material. *See id.* at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict-'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'"). A fact is "material" for purposes of summary judgment when proof of that fact would have the effect of establishing or refuting an essential element of the claim or a defense advanced by either party. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

In considering a motion for summary judgment, the court must view the facts and draw all reasonable inferences from those facts in a manner most favorable to the nonmoving party. *Wexler v. White's Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). The court is not to weigh the evidence to determine the truth of the matter, but must determine if there is a genuine issue for trial. *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

## IV. DISCUSSION

### 1. Jurisdiction

The court is not persuaded by the various arguments contending that the court at the outset lacks jurisdiction over some or all of this case. The court clearly has original jurisdiction over Plaintiff's § 1983 claims, as they raise federal questions. Accordingly, and pursuant to 28 U.S.C. § 1367, the court has supplemental jurisdiction over Plaintiff's state law claims. Those claims are "so related to claims in the action within such

original jurisdiction that they form part of the same case or controversy" 28 U.S.C. § 1367(a).[8]

### 2. Plaintiff's § 1983 Claims

To prevail on her claims under 42 U.S.C. § 1983, Plaintiff must demonstrate: (1) a deprivation of a right secured by the Constitution or laws of the United States; (2) caused by a person acting under color of state law; (3) occurring without due process of law. 42 U.S.C. § 1983; *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 995 (6th Cir. 1994). Viewed in the light most favorable to Plaintiff, the record does not support a question of fact regarding the third element.

### a. Individual Defendants Jonoshies and Roe

The court finds no serious dispute concerning the first two elements of Plaintiff's § 1983 claims. Involuntary commitment, however temporary, necessarily deprived Plaintiff of her constitutional right to liberty. *See e.g. Vitek v. Jones*, 445 U.S. 480, 494 (1980) ("[T]he stigmatizing consequences of a transfer to a mental hospital for involuntary psychiatric treatment, coupled with the subjection of the prisoner to mandatory behavior modification as a treatment for mental illness, constitute the kind of deprivations of liberty that requires procedural protections."). It is also clear that the involvement of police and public safety dispatch personnel in taking Plaintiff into custody means that her deprivation of liberty was caused by a person acting under state law. *See e.g. Swiecicki v. Delgado*, 463 F.3d 489 (holding that a uniformed off-duty officer who escorted an arrestee out of a stadium was acting under color of law). In this case,

---

[8]While supplemental jurisdiction is facially appropriate, the court will later conclude that it is appropriate to decline the exercise of such jurisdiction because none of Plaintiff's federal claims will remain. *See* U.S.C. § 1367(c); *infra* page 14.

Jonoshies was on duty and responded to an official dispatch when he sought Plaintiff at her home, took her into custody, and drove her back to the hospital.

The crucial dispute instead centers on the third element of Plaintiff's § 1983 claims: whether she was afforded due process of law.  Plaintiff's § 1983 claims must fail because the record demonstrates as a matter of law that her involuntary stay at the hospital complied with the procedures required under Michigan law.  Those procedures are specified in the mental health code provisions of Michigan Compiled Laws § 330.1400 *et seq*, and, specifically, § 1403, which states that "[i]ndividuals shall receive involuntary mental health treatment only pursuant to the provisions of this act." Contrary to Plaintiff's arguments, those provisions in her case do not require a court order, warrant, or other judicial action.[9]

The statute defines a "person requiring treatment" as follows:

[a]n individual who has mental illness, and who as a result of that mental illness can reasonably be expected within the near future to intentionally or unintentionally seriously physically injure himself or herself or another individual, and who has engaged in an act or acts of made significant threats that are substantially supportive of the expectation.

Mich. Comp. Laws § 330.1401(a).  The language on the petition that Defendant Nurse Ackerman completed closely tracks the above language of the statute.  Mental illness,

---

[9]In particular, Plaintiff errs to the extent that her arguments suggest that § 1408 was the sole way to return her to the emergency room and that, because its procedures were not followed, she was deprived due process of law.  Under § 1408 a person is "subject to being returned to a hospital" if (1) the person "was admitted to the hospital by judicial order" and (2) the person "has left the hospital without authorization, or has refused a lawful request to return to the hospital while on an authorized leave or otherwise authorized absence from the hospital."  § 1408.  Although, due to lack of a judicial order, § 1408 did not by its terms apply to Plaintiff, the implication is not necessarily that she could not have otherwise been returned to the hospital.  As explained below, the statute has other provisions for, in the absence of a judicial order, involuntary admission of a person requiring treatment.

according to the statute, is "a substantial disorder of thought or mood that significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life." § 1400(g).

> The statute *requires* hospitalization of persons certified as requiring treatment:
>
> A hospital designated by the department or by a community mental health services program *shall* hospitalize an individual presented to the hospital, pending receipt of a clinical certificate by a psychiatrist stating that the individual is a person requiring treatment, if an application, a physician's or a licensed psychologist's clinical certificate, and an authorization by a preadmission screening unit have been executed.

§ 1423 (emphasis added). A clinical certificate is defined as "the written conclusion and statements of a physician or a licensed psychologist that an individual is a person requiring treatment, together with the information and opinions, in reasonable detail, that underlie the conclusion, on the form prescribed by the department or on a substantially similar form." § 1400(a). The certificate must be "executed after personal examination of the individual named in the clinical certificate, and within 72 hours before the time the clinical certificate is filed with the hospital." § 1425. Although the parties differ regarding whether Defendant Brown observed Plaintiff for five minutes or for two hours, under either scenario Brown as a matter of law met the requirement of "personal examination" under § 1425. While Plaintiff disputes the conclusions of Brown that make up the substance of the clinical certificate, the court finds no material issue of fact concerning whether Brown followed the proper procedure.[10] Furthermore, for purposes

---

[10]In other words, the parties' apparent dispute concerning whether Plaintiff was in fact a person requiring treatment does not decide the question of whether the above-named individual defendants violated Plaintiff's constitutional rights. The relevant question, which does not present an issue of fact, is whether Plaintiff suffered a deprivation of her liberty interest *without due process of law*.

of Plaintiff's § 1983 claims, the relevant actors are Defendants Roe and Jonoshies, who had no role in formulating Brown's clinical certificate. The court therefore need not decide whether Brown or Plaintiff was right, or whether Marshall's report should have controlled. For purposes of § 1983, these considerations are irrelevant, and in any event invite the court to improperly weigh the evidence and make credibility determinations in violation of Rule 56.

Section 1426 authorized, and indeed *required*, Defendant Jonoshies to take Plaintiff into custody:

> Upon delivery to a peace officer of an application and physician's or licensed psychologist's clinical certificate, the peace officer *shall* take the individual named in the application into protective custody and transport the individual *immediately* to the preadmission screening unit or hospital[.]

§ 1426 (emphasis added). Defendant Roe, in her capacity as dispatcher, relayed information to Jonoshies that caused him to take Plaintiff into custody. Her dispatch constituted delivery of the clinical certificate to Jonoshies, who at the hospital then obtained a paper copy to attach to his police report. Plaintiff has presented the court with no authority requiring Roe or Jonoshies to somehow verify, double-check, or investigate the truth underlying Brown's certificate. The court has difficulty imagining how that would be possible, particularly in light of the fact that § 1426 required Jonoshies to take *immediate* action. Rapid response makes further sense in light of the elements of dangerousness and imminence laid out in the statutory definition of a person requiring treatment. § 1401(a).

Recognizing the importance of efficacious implementation of the above procedures, Michigan grants peace officers qualified immunity under the statute. "A

13

peace officer who acts in compliance with this act is acting in the course of official duty and is not civilly liable for the action taken." § 1427b(1). The statute does not extend qualified immunity to "behavior involving gross negligence or wilful and wanton misconduct." § 1427b(2). The record before the court, however, does not create a material issue of fact concerning whether Jonoshies or Roe acted in violation of § 1427(b)(2). The allegations in Plaintiff's complaint concerning gross negligence, even if the court presumes that they are true, are nevertheless predicated upon Plaintiff's unsupported conclusion of law that only court process could authorize these Defendants to act.[11] Because the record before the court creates no issue of fact concerning the due process that Plaintiff received, Plaintiff has failed to state § 1983 claims against Defendants Jonoshies and Roe.[12]

---

[11] Furthermore, Plaintiff's allegations are difficult to square with her affidavit, which states that Jonoshies did not handcuff Plaintiff, that [b]oth officers were very nice[,]" and that she was even offered a cigarette while riding back to the hospital. (10/4/06 Pl.'s Aff. at ¶¶ 7, 9, Pl.'s 10/7/06 Br., Ex. 1.)

[12] Plaintiff cites *Fisher v. Harden*, 398 F.2d 837 (6th Cir. 2005), for the proposition that qualified immunity does not exist for mental health seizures of a person where there is no probable cause for believing that an emergency existed. The facts of *Fisher*, however, are distinguishable. In that case, the officers responded to a call claiming that a man who appeared suicidal had tied his feet to railroad tracks. *Id.* at 839-840. The Sixth Circuit held that the officers who responded observed no behavior that "the officers considered to be suspicious or threatening," *id.* 833, and that the use of force to detain the man, who as a result suffered a heart attack, "exceeded what was required for an investigative stop" and that "[i]n the absence of probable cause, such [an arrest] violates the constitution." *Id.* at 845.
 The instant case, however, presents a crucial factual distinction. Defendant Jonoshies was not responding to a call that by its nature required investigation to determine the alleged dangerousness of Plaintiff. He was instead called to take Plaintiff into custody pursuant to a certificate that had already decided Plaintiff was a person requiring treatment and, therefore, potentially dangerous to herself or others. Under the Michigan Health Code, it was neither his duty nor his option to second-guess the determination of the medical personnel at the hospital. In *Fisher*, however, the police officers were responding to a mere citizen telephone tip that called for further inquiry.

14

### b. Defendant Jackson County

Plaintiff's theory of liability against Defendant Jackson County also lacks merit. The allegations in her complaint center upon the County's purported indifference to her constitutional rights because the County failed to properly train dispatchers and to keep a database of mental health orders. This theory fails for the reasons stated above that Jonoshies and Roe did not have to reinvestigate Brown's clinical certificate. The role of the County in maintaining emergency dispatch services is in large part ministerial and mechanical. Furthermore, state law determines the procedures for taking a person requiring treatment into custody. As discussed above, those procedures in this case required immediate action, which precludes the sort of veto or double-check power for which Plaintiff seems to argue. Whatever process Plaintiff was due, the County's purported policies covering training and databases did not as a matter of law deny Plaintiff any due process. She has presented no issue of material fact regarding the conduct of the County. Plaintiff has therefore failed to state a § 1983 claim against the County.

---

The instant case would more closely resemble *Fisher* if Jonoshies had arrested Plaintiff pursuant to § 1427(1) based only on his observation of her. To the extent that Plaintiff argues that the law required Jonoshies to make such observations when he encountered her at her home, Plaintiff is mistaken. That reading of the statute would eviscerate § 1426, which requires peace officers to execute clinical certificates and § 1427b, which grants them qualified immunity.

15

### 3.  Plaintiff's Remaining Claims under State Law

While the court has discretion to exercise jurisdiction over Plaintiff's state law claims, it is appropriate now for the court to decline exercising jurisdiction over those claims.  A district court may decline to exercise jurisdiction over claims allowed in federal court pursuant to subsection (a) if "the district court has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c).  The court, pursuant to the above analysis, has dismissed all claims in this case over which it had original jurisdiction.  The court will therefore decline to reach Plaintiff's remaining claims under state law.

### V.  PLAINTIFF'S MOTION TO AMEND HER COMPLAINT

Plaintiff filed a motion on November 3, 2006 seeking leave to amend her complaint under Federal Rule of Civil Procedure 15.  Because all Defendants served Plaintiff with responsive pleadings before Plaintiff sought to amend, Plaintiff may amend her complaint "only by leave of the court or by written consent of the adverse part[ies.]" Fed. R. Civ. P 15(a).  Only Defendant Brown gives her written consent.  The court must therefore consider whether leave to amend is warranted in light of the requirement that "leave shall be freely granted when justice so requires."  *Id.*

The court is not convinced that justice requires granting Plaintiff leave to amend her complaint.  Plaintiff seeks to add a count of medical malpractice under state law against psychiatrist Samy Wassef.  Plaintiff contends that she could not file this claim earlier because state law requires filing of a notice of intent with time to respond for a medical malpractice defendant.  Plaintiff also wants to assert a separate theory of 14th Amendment liability under § 1983 against Defendants Jonoshies, Roe, and Jackson

County. Concerning her new theory, Plaintiff gives no reason for its late assertion. She instead offers that the relevant Defendants may be "deemed to have denied the 14th Amendment claims against them in Counts I and II without further need to file a written answer." (Pl.'s 11/3/06 Mot. for Leave to File Am. Compl. at 2.)

The court expresses no view on whether Plaintiff's delay in bringing a medical malpractice claim against Wassef is excusable. However, based upon the court's disposition of the other state law claims, it is clear that the court would in any event decline to exercise supplemental jurisdiction over this claim. Plaintiff's attempt to augment her § 1983 claim does not alter the court's conclusion. Plaintiff had ample time to frame her § 1983 counts and to assert whatever theories might reasonably exist. Moreover, the relevant defendants have relied on Plaintiff's original complaint in articulating their motions for and briefs in support of dismissal and summary judgment. *See e.g. Foman v. Davis*, 371 U.S. 178, 182 (1962) (holding that denial of leave to amend may be appropriate when there would be undue prejudice to the opposing party if leave were granted). Even if these Defendants can be automatically "deemed" to deny the new theory and therefore they would not have to file amended responses, the same cannot be said for their pending motions. Plaintiff would instead suddenly convert those motions to motions only for partial dismissal or partial summary judgment. The motion practice in this case has proceeded altogether too far for Plaintiff to now insist on

a new landscape in her complaint.[13]  The court will therefore deny Plaintiff's motion to file an amended complaint.

### VI.  CONCLUSION

IT IS ORDERED that Defendants Jonoshies, Roe, and Jackson County are GRANTED summary judgment for Counts I and II.

IT IS FURTHER ORDERED that "County Defendants' Motion for Dismissal and Summary Judgment" [Dkt #36] is GRANTED IN PART AND DENIED IN PART and that Defendant Jonoshies's "Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(B)(6), or, Alternatively, Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56(c)" [Dkt # 38] is GRANTED IN PART AND DENIED IN PART.

IT IS FURTHER ORDERED that Counts III-V are DISMISSED WITHOUT PREJUDICE.  Accordingly, "Defendants, Desiree Auckerman and W.A. Foote Memorial Hospital's, Motion for Summary Judgment" [Dkt #28] and "Defendant Donna Brown, D.O.'s Concurrence . . ." [Dkt #29] are DENIED AS MOOT.

IT IS FURTHER ORDERED that Plaintiff's "Motion for Leave to File Amended Complaint" [Dkt # 48] is DENIED.

                                           s/Robert H. Cleland  
                                          ROBERT H. CLELAND  
                                          UNITED STATES DISTRICT JUDGE

Dated:  November 21, 2006

---

[13] Furthermore, while not determinative, the court is mindful of its doubts that a different theory of liability would lead to a different outcome in its § 1983 analysis. Whatever constitutional right Plaintiff asserts under § 1983, she still must show deprivation *without due process of law*.  Plaintiff's § 1983 claims would likely still fail.

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, November 21, 2006, by electronic and/or ordinary mail.

        s/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522